IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUCE NEWLAND AND JENNY NEWLAND,<br><br>    Plaintiffs,<br><br>    v.<br><br>THE PROGRESSIVE CORPORATION; PROGRESSIVE CASUALTY INSURANCE COMPANY; PROGRESSIVE MARATHON INSURANCE COMPANY; PROGRESSIVE HALCYON INSURANCE COMPANY; AND DOES 1-50, inclusive,<br><br>    Defendants. | CIV-S-05-01405 DFL PAN<br><br><u>MEMORANDUM OF OPINION<br>AND ORDER</u> |

Plaintiffs Bruce and Jenny Newland ("the Newlands") submitted an insurance claim to Progressive seeking compensation for damage to their car.[1]  After Progressive refused to pay the claim and accused the Newlands of vandalizing the car themselves, the Newlands brought suit.

Progressive moves for partial summary judgment against the

---

[1] The various Progressive entities listed as defendants will be referred to simply as "Progressive" or "defendant."

1

Newlands on their claims for: (1) breach of the implied covenant of good faith and fair dealing; (2) punitive damages; (3) violation of the Consumer Legal Remedies Act ("CLRA"); and (4) violation of the Unfair Competition Act, Business and Professions Code § 17200 ("UCA").[2]  Because the Newlands agreed to a voluntary dismissal of the UCA claim at oral argument, the court addresses only whether summary judgment is appropriate for the first three claims noted above.  For the reasons stated below, the court DENIES Progressive's motion as to claims 1 and 2 but GRANTS its motion as to claim 3.

I.

On September 11, 2003, the Newlands reported their Volvo S80 missing after returning home from a two-day vacation.  (Mot. at 1.)  Progressive assigned the case to its adjuster Kelly Dobbins.  (Pl.'s SUF ¶ 4.)  On September 16, Dobbins took a recorded statement from Jenny Newland about the Newlands' financial situation and the circumstances surrounding the disappearance of the car.  (Id.)  Dobbins concluded from the interview that the Newlands were experiencing financial pressure because of high expenses, including the car payments for the Volvo.  (Id. ¶ 11.)  Also, she discovered that the Newlands had been trying to sell the Volvo, (id. ¶ 10.), but that they were "upside down" on the car because they owed more on the car, by several thousand dollars, than the one offer they had received.  (Id. ¶ 128.)

---

[2] Progressive does not seek summary judgment on the Newlands' breach of contract claim.

2

Dobbins suspected fraud and referred the case to Progressive's Special Investigation Unit ("SIU"). (Id. ¶ 11.)

On September 17, Dobbins reviewed the Newlands' credit report and noted that the account balances were higher than Jenny Newland had indicated. (Id. ¶ 16.) The parties dispute whether Dobbins interpreted the report correctly. (Id.) According to the Newlands, further investigation would have revealed that the high credit card balances were temporary and coincided with Jenny Newland's maternity leave and Bruce Newland's change in jobs. (Opp'n at 6-8.)

Progressive's special investigator Greg Jackson then took over the investigation. He canvassed the neighborhood, speaking to potential witnesses about the theft. (Id. ¶ 22)

On September 22, there was a new development: Bruce Newland notified Progressive that the vehicle had been recovered. (Id. ¶ 23.) Jackson inspected the vehicle and found significant damage to the interior. (Id. ¶ 34.) He also found a hatchet inside the car that appeared to have been the implement of the damage. (Id.) But Jackson noted that valuable items such as the stereo and airbags were "intact and undisturbed," and that there was no damage to the ignition, steering wheel, and steering column, suggesting that the thief had a key. (Id.)

Dobbins learned on September 23 that the car when purchased may have come with two regular keys and a valet key. (Id. ¶ 28.) However, the Newlands told her that they had not received a valet key. (Id. ¶ 28.) Jackson then interviewed various people at

3

1  Turner Volvo, where the Newlands bought the car, to inquire into
2  whether the Newlands received this "third" key. (Id. ¶¶ 31, 32.)
3     On September 30, Jackson conducted recorded interviews with
4  the Newlands. (Id. ¶ 40.) In his interview with Bruce Newland,
5  Jackson asked various questions about the theft but repeatedly
6  implied that the Newlands themselves were the chief suspects.
7  (See id.) For example, "[h]e state[d] to Newland that he was
8  struggling to figure out how the car was unlocked and how it was
9  driven to the place it was recovered without the keys." (Id.)
10 He also declared, "[A] lot of people who own vehicles that either
11 can't get rid of them or, want to get rid of them, they have been
12 known to do things to their vehicles." (Id.) And, in an
13 apparent attempt to trick Bruce Newland into confessing, Jackson
14 told him that the Volvo had a "black box" that would indicate
15 which key was used last. (Id.) Of course, there was no such
16 black box.
17    In his interview with Jenny Newland, Jackson made similar
18 accusations. He said, "I mean all the fingers are pointing to
19 you and your husband." (Id. ¶ 41.) He told her that he
20 understood how frustrating it was to have to high car payments.
21 (Id.) Furthermore, he explained that "people vandalize their
22 cars to get a new interior because it would be easier to sell."
23 (Id.)
24    From October to late December, Jackson and Dobbins continued
25 the investigation. Much of the focus of the investigation was on
26 the existence and whereabouts of the supposed valet key. The

4

1  Newlands maintained that if there was a valet key, it would have
2  been inside the owner's manual in the glove box.  (Id. ¶ 54.)
3  They did not remember receiving the key, but they told the
4  investigators that it was their understanding that the dealership
5  usually packaged the valet key inside the manual.  (Id.)  They
6  said they had never looked through the manual.  (Id.)  This was
7  important because if the key had still been in the manual, it was
8  a possible explanation for how the thief had taken the car
9  without damaging the ignition.

10     On November 12, Jackson spoke to the service manager and
11  technician of Turner Volvo about the possibility that the
12  Newlands received a valet key.  (Id. ¶ 56.)  Progressive also
13  deposed Jorgen Eiremo, a salesman at Turner Volvo, who had turned
14  the car over to Bruce Newland.  (Id. ¶ 57).  Eiremo testified
15  that he usually handed all of the keys, including the valet key,
16  over to the purchaser, instead of placing it in the manual.  (Id.
17  ¶ 57.)

18     Jackson and Dobbins also spent considerable time
19  investigating a purported discrepancy regarding whether the
20  Newlands had ever replaced the car's tires.  (Id. ¶¶ 48, 49, 50,
21  51.)  Bruce Newland had mentioned in his recorded interview with
22  Jackson that he thought he may have replaced the tires once
23  before but became more and more uncertain after further
24  questioning.  (Id. ¶ 48.)  After examining the tires, Jackson and
25  Dobbins determined that the Newlands likely never replaced the
26  tires.  (Id. ¶ 50.)

1  On December 18, Progressive's managers, Jackson, Dobbins, and others decided to deny the Newlands' claim based on suspicion of fraud because of "misrepresentations" and "financial motives." (See id. ¶¶ 59, 60, 61.)

After the denial, the Newlands sent Progressive two letters requesting reconsideration, which Progressive denied. (See id. ¶¶ 64, 65.) The February 3, 2005 letter from the Newlands argued that an inexperienced thief might have stolen the Volvo after finding the valet key in the glove compartment. (Id. ¶ 65.) The Newlands submitted declarations from managers at Turner Volvo that it was customary for the dealership to package the valet key with the owners' manual. (Id.) Progessive considered the reconsideration request and denied it, concluding that "the information provided by the salesman who actually sold the vehicle to the Newlands as to how they received the valet key was better information than the custom and practice declaration." (Id. ¶ 67.)

II.

A. <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

The Newlands contend that Progressive breached the implied covenant of good faith and fair dealing because it "unreasonably failed" to pay the insurance claim on the car. (Opp'n at 4.) According to the Newlands, "There is no evidence whatsoever, that [they] had anything to do with its disappearance." (Id. at 14.) While this may overstate the matter, there is no direct evidence that the Newlands took or damaged their own car, and a

6

jury could reasonably conclude that Progressive leapt to such a conclusion from inadequate premises.

An insurer breaches the implied covenant of good faith and fair dealing for denying coverage when "the refusal to pay policy benefits was *unreasonable*." Chateau Chamberay Homeowners Ass'n v. Assoc. Int'l Ins. Co., 90 Cal. App. 4th 335, 346 (2001) (quoting Opsal v. United Servs. Auto Ass'n, 2 Cal. App. 4th 1197, 1205 (1991). Refusing to pay is not "unreasonable" when the insurer can demonstrate that a "genuine issue" regarding coverage exists. Id. at 347; see also Guebara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001) ("Under California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage.") One way an insurer can establish a "genuine issue" is by showing that it denied coverage based on expert opinions. Fraley v. Allstate Ins. Co., 81 Cal. App. 4th 1282, 1293 (2000).

While most "genuine issues" involve questions of law regarding coverage, courts have found a "genuine issue" created by questions of fact. See Chateau Chamberay, 90 Cal. App. 4th at 350; see also Phelps v. Provident Life & Acc. Ins. Co., 60 F. Supp. 2d 1014, 1022-24 (C.D. Cal. 1999). But in such cases, the insurer relied on expert opinions, Chateau Chamberay, 90 Cal. App. 4th at 340; Phelps, 60. F. Supp. 2d at 1018, and independently discovered evidence that strongly suggested that coverage was not called for. See Chateau Chamberay, 90 Cal. App. 4th at 349 (finding a "genuine issue" where the insurer relied on

7

expert opinions and other evidence that disputed the insured's valuation of the claim); see also Phelps, 60 F. Supp. 2d at 1022-24 (finding a "genuine issue" where the insurer ceased paying benefits on a disability claim based on consultations with experts and surveillance video showing the insured participating in activities inconsistent with the claim).

Here, a jury could find that Progressive's refusal to pay the Newlands' claim was unreasonable because Progressive neither relied on expert opinions nor found clear evidence that the Newlands vandalized their own car. Instead, they relied on inconsistent statements by the Newlands to draw an inference of their guilt when other inferences were also possible, such as innocent failures of recollection. A jury could find that Progressive unreasonably seized on several inconsistent statements by the Newlands to spin them into a patchwork theory that lacks persuasive power.

Progressive argues that the Newlands had the financial motive to commit insurance fraud because they were "upside down" on their car; they had received only one offer for the car that was for less than the outstanding balance. But for there to be a financial motive, the Newlands must have believed that the insurance company would pay more than the market price to compensate for a stolen car. Progressive does not explain why it was justified in ascribing such a belief to the Newlands.

Moreover, Progressive focused much of its investigation on the whereabouts of the valet key. It never explains, however,

how this purportedly missing key fits into its theory that the Newlands vandalized their own car. Rather, the valet key is more consistent with Newlands' explanation.

Finally, Progressive cites inconsistent statements that Bruce Newland made about possibly having replaced the tires before the car was stolen. Presumably, this discrepancy is tangentially relevant because it raises questions about the Newlands' trustworthiness. But a person who makes inconsistent statements is not always lying, and the inconsistency here is not so powerful that the court can decide the good faith claim as a matter of law given the absence of direct evidence and the arguable tenuousness of Progressive's circumstantial evidence. The question of reasonableness remains a disputed issue that cannot be resolved on summary judgment.

B. <u>Punitive Damages</u>

Plaintiffs may recover punitive damages in tort actions when they establish, by clear and convincing evidence, "oppression, fraud, or malice."[3]  Cal. Civ. Code § 3294. The primary purpose of § 3294 is "to deter acts deemed socially unacceptable and, consequently, to discourage the perpetuation of objectionable corporate policies." <u>Egan v. Mut. of Omaha Ins. Co.</u>, 24 Cal. 3d

---

[3] Section 3294(a) states, "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Cal. Civ. Code § 3294(a) (2006).

9

809, 820 (1979). The availability of punitive damages is deemed particularly important in the insurance context because the "special relationship between the insurer and the insured." Id. (noting that punitive damages help ensure that insurers fulfill the special responsibilities to the public that come with providing a "public service" and holding themselves out as "fiduciaries.")

For example, punitive damages may be proper when an insurer badgers and mocks the insured. See Egan, 24 Cal. 3d at 821. In Egan, the insured tried to make a claim under his disability insurance after he injured his back. Id. at 815. The claims manager, however, suspected fraud and accused the insured of pursuing the claim "only because he did not want to return to work." Id. at 821. There were other such accusations. See id. at 821-22. The California Supreme Court found that a punitive damage award was supported by the evidence. Id. at 821.

Here, a reasonable jury may similarly conclude that Progressive's conduct justifies an award of punitive damages. Progressive's special investigator, Jackson, arguably badgered the Newlands. As in Egan, where the claims manager accused the insured of fraud, Jackson repeatedly accused the Newlands of stealing and vandalizing their own car.

C. The CLRA

The Newlands also argue that they are entitled to damages under the CLRA because of Progressive's purportedly "unreasonable" denial of benefits. (Compl. ¶ 64-65.) In

10

response, Progressive contends that the CLRA does not apply to insurance. (Mot. at 16.)

"The CLRA bars certain specified 'acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer.'" Bacon v. Am. Int'l Group, 415 F. Supp. 2d 1027, 1035 (2006) (quoting Cal. Civ. Code § 1770 (2006)). Although no California court has ruled specifically on the issue, the California Supreme Court has said in dicta that "insurance is technically neither a 'good' nor a 'service' within the meaning of the act."[4] Civil Serv. Employees Ins. Co. v. Super. Ct., 22 Cal. 3d 362, 376 (1978). Moreover, one federal district court interpreting California law has found that the CLRA does not apply to insurance cases, noting that the California Supreme Court case "represents the best indication of how the California Supreme Court would rule on the issue were the issue to come squarely before it." Bacon, 415 F. Supp. 2d at 1036. The court concurs with this assessment and finds that the CLRA does not apply here.

## III.

For the reasons stated above, the court DENIES Progressive's motion as to the Newlands' breach of the implied covenant of good

---

[4] One court has applied the CLRA to an insurance case. Mass. Mut. Life Ins. Co. v. Super. Ct., 97 Cal. App. 4th 1282, 1286 (2002). But, as Progressive points out, the issue of whether the CLRA should apply was not before that court. (Mot. at 16.)

faith and fair dealing and punitive damages claims but GRANTS its motion as to the CLRA claim.

IT IS SO ORDERED.

Dated: August 30, 2006

_____
DAVID F. LEVI
United States District Judge